IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 24, 2018

**STATE OF TENNESSEE v. DEMETRIUS GRIMES**

**Appeal from the Criminal Court for Knox County**
**No. 103500A  Bobby R. McGee, Judge**

———————————————————

**No. E2017-01022-CCA-R3-CD**

———————————————————

The Defendant, Demetrius Grimes, was convicted of two counts of attempted first-degree murder; five counts of employing a firearm during a dangerous felony; four counts of employing a firearm during the commission of a dangerous felony with a prior dangerous felony conviction; two counts of attempted especially aggravated robbery; two counts of attempted carjacking; one count of attempted first-degree murder with serious bodily injury; two counts of assault; and one count of simple possession of a controlled substance, third offense. The sentences for the attempted first-degree murders of Michael Dixon and Carl Chesney were ordered to be served consecutively to each other, as well as to both of the 10-year sentences for employing a firearm during a dangerous felony, which were, in turn, to be served consecutively to each other, resulting in a total effective sentence of sixty years. Further, all the sentences were to be served consecutively to a sentence for a prior conviction. On appeal, the Defendant asserts that, since the State argued at trial that Michael Dixon was the intended target of the shots, the attempted first-degree murder conviction for the shooting of Carl Chesney could not stand. Further, the Defendant argues on appeal that the multiple convictions for employment of a firearm during the commission of multiple dangerous felonies cannot stand, for the evidence showed that the Defendant used only one weapon, thus supporting only a single firearm conviction; and that the trial court erred in ordering consecutive sentencing. The State agrees on appeal that the court erred as to sentencing in Counts 15 through 18, which enhanced the Defendant's sentences for employing a firearm during the commission of four attempted dangerous felonies, for the prior felonies upon which the enhancement was based, were not "dangerous" felonies, as required by statute, but, rather, were simple drug possession convictions. Accordingly, we reverse the convictions as to Counts 15 through 18 and dismiss those charges. We reinstate the convictions for Counts 2, 4, 8, 10 and 12, which were merged into Counts 15 through 18, and remand for entry of amended judgments. We conclude that the other issues raised on appeal by the Defendant are without merit.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed in Part, Reversed in Part, Case Remanded**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

J. Liddell Kirk (on appeal); Mary L. Ward (at trial), Knoxville, Tennessee, for the appellant, Demetrius Grimes.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Charme P. Allen, District Attorney General; and Takisha Fitzgerald and Phillip H. Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

As we will set out, the State's proof showed that the Defendant fired shots with a pistol at B.J.'s Market in Knoxville on the evening of March 8, 2014, striking Carl Chesney and Michael Dixon. Mr. Chesney had no prior connection with the Defendant, while Mr. Dixon was acquainted with Mr. Ramod Shepard, a passenger in the Defendant's vehicle, from when both were inmates at the same prison. The Defendant fired approximately seven shots in all, striking Mr. Dixon twice in the leg and Mr. Chesney once in the foot. Now, we will review the trial testimony.

The first two witnesses for the State were Michael Alan Mayes and Cheryl Green. Mr. Mayes, the record keeper for the Knox County Emergency Communications District, played a recording of the 9-1-1 calls from B.J.'s Market just after the shooting. Ms. Green testified regarding the medical records of the victim, Michael Dixon, and his injuries as the result of being wounded. Danielle Wieberg testified that she was a crime scene technician with the Knoxville Police Department and various photographs taken at the crime scene received as exhibits during her testimony, as well as various items of physical evidence collected at the scene.

Steven Charles Lundy, Sr., testified that he was working at B.J.'s Market the evening of the shooting, when he heard gunshots and saw people running. One of the wounded men came into the store and fell down, and Mr. Lundy continued to hear shots being fired outside. He testified that he had identified the Defendant in a photo lineup as the shooter, and he identified the Defendant again in the courtroom.

Carl Chesney testified that that he had been wounded while at B.J.'s Market on March 8, 2014. He was shot in the foot while he was outside, waiting for a food order. He said he did not see who shot him.

Michael Dixon was wounded the same evening, also at B.J.'s Market, where he had driven his vehicle to purchase gasoline, when he was returning to his vehicle after paying for it. On the way to his car, he recognized Ramod Shepard, whom he earlier met when they were incarcerated at the same penal institution. Mr. Shepard got out of a black car, which had just pulled up to Mr. Dixon, as did the Defendant, Demetrius Grimes. The Defendant was armed with a pistol, which he pointed at Mr. Dixon, demanding the keys to his car. A third man got out of the black car, as well as a woman, Latickia Burgins, who was repeatedly saying to the victim, "just give him the keys." As she got into the victim's car, the Defendant pointed his pistol at the victim, saying he would shoot if he were not given the keys. The Defendant pulled the trigger, but his weapon misfired. As the victim then ran back towards the store, he heard gunshots and was struck twice in one of his legs. He was taken to a hospital, where he received two blood transfusions, and had two operations, with a rod being inserted into his leg. The victim said that he now walks with a limp, and his leg swells daily. Mr. Dixon said he had identified the Defendant as his shooter in a photographic lineup while in the hospital, and he identified the Defendant during his testimony.

Tim Riddle testified that he was employed by the Knoxville Police Department as a major crimes investigator and had responded to the shooting call at B.J.'s Market. From witnesses at that location, he learned that the shooter was a black male, with long dreadlocks, who had been wearing "fancy glasses." He later met in the hospital with Mr. Dixon, who told him that Ms. Burgins had been involved in the shooting, as well as the Defendant, whom the victim knew as Demetrius or Demetria Grimes. The other victim, Mr. Chesney, was reluctant to speak with Officer Riddle or to assist in the prosecution of the shooting. When shown the photographic lineup, Mr. Chesney pointed to the photograph of the Defendant but refused to sign the card as having done so. Officer Riddle testified regarding the surveillance video from the time of the shooting, saying it showed Ramod Shepard getting out of a black car, followed by the Defendant, who put a gun in Mr. Dixon's face. The Defendant then fired the weapon, sending others running, returned to his vehicle and drove off with his companions. Following this testimony, the State rested its case-in-chief. The Defendant presented no witnesses at the trial.

## ANALYSIS

### I. Sufficiency of the Evidence

### A. Standard of Review

On appeal, the Defendant asserts that the evidence was insufficient to support the guilty verdicts for the attempted first-degree premediated murder of Carl Chesney and for the five counts of employing a firearm during the commission of a dangerous felony. The State disagrees with this argument, as do we.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-91 (Tenn. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). In Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)), our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin, 405 S.W.2d at 771.

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Applying these standards, we will review the convictions challenged by the Defendant on appeal.

B. Conviction for the Attempted First-degree Murder of Mr. Chesney

Pointing to the fact that the State had argued to the jury that the Defendant's intended shooting victim was Mr. Dixon, not Mr. Chesney, the Defendant asserts that he cannot be convicted for the attempted first-degree murder of Mr. Chesney because he was wounded by a bullet intended for Mr. Dixon. The State disagrees with this argument; and, as we will explain, so do we.

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense," acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a), (a)(2). First-degree murder is defined as "[a] premeditated and intentional killing of another." Id. § 39-13-202(a)(1). Further:

> "Premeditation" is an act done after the exercise of reflection and judgment, and means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. An additional factor from which a jury may infer premeditation is evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). State v. Jeremy Jones, No. W2015-01528-CCA-R3-CD,

2016 WL 7654954, at *4 (Tenn. Crim. App. Sept. 26, 2016), perm. app. denied (Jan. 20, 2017).

In this matter, as we have set out, the Defendant is appealing the sufficiency of the evidence as to his conviction for the shooting of Carl Chesney. Taken in the light most favorable to the State, the evidence at trial showed that the Defendant intended to take Mr. Dixon's vehicle and was willing to shoot him to do so. After Mr. Dixon did not comply with the demand for the keys to the vehicle, the Defendant aimed the pistol at Mr. Dixon, but it misfired. As Mr. Dixon ran towards the market, the Defendant kept shooting, wounding Mr. Dixon twice and Mr. Chesney once. Mr. Lundy, Sr. and Mr. Dixon both identified the Defendant as the person firing the shots that wounded the two victims. From this, we find a reasonable jury could have concluded that the Defendant committed the attempted first-degree premeditated murder of the two victims during the attempted car-jacking of Mr. Dixon's vehicle.

Additionally, the Defendant argues on appeal that only the conviction for the attempted first-degree premeditated murder of Mr. Dixon can stand, because the Defendant's intent was to shoot Mr. Dixon, but not Mr. Chesney. He asserts that the doctrine of transferred intent cannot be applied because Mr. Dixon was the only intended target. The State responds that the Defendant failed to present this argument either at the trial or the motion for new trial, and that this contention is waived, absent a plain error review. As we will explain, even if we proceeded with a plain error review, the Defendant's claim still would fail.

In Millen v. State, 988 S.W.2d 164 (Tenn. 1999), the defendant had fired his pistol at the intended victim but killed a bystander. Our supreme court held that Tennessee Code Annotated section 39-11-302(a) did not require that a defendant kill his intended victim:

A plain reading of this statute as applied to first-degree murder indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., "cause the result." In short, if the evidence demonstrates that the defendant intended to "cause the result," the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first-degree murder.

Id. at 168.

- 6 -

Applying the holding in <u>Millen</u>, this court concluded in <u>State v. Joseph Jackson, Jr.</u>, No. W2001-02779-CCA-R3-CD, 2002 WL 31887657, at \*4 (Tenn. Crim. App. Dec. 17, 2002), <u>no perm. app. filed</u>, that if a defendant fires a weapon, intending to kill one person, but strikes another instead, the intent to injure the intended victim transfers to the actual victim. We disagree with the Defendant's argument that the holding in <u>State v. Ronald Turner</u>, No. E2016-00651-CCA-R3-CD, 2017 WL 18300106, at \*6 (Tenn. Crim. App. May 5, 2017), <u>no perm. app. filed</u>, is applicable to this appeal, for, in that case, only a single shot was filed, and this court concluded that a single shot could not provide the basis for multiple attempted homicide convictions.

This claim is without merit.

### C. Convictions for Employing a Firearm during Commission of a Dangerous Felony

As we have set out, the Defendant was convicted of multiple counts for the use of a firearm to commit a dangerous felony, and he argues on appeal that the multiple firearm convictions violate his protection against double jeopardy. The State responds that this claim is waived because it was not made either at trial or in the motion for new trial. Even if we were to conduct a plain error review of this matter, the Defendant would not benefit, for, since the trial in this case, our supreme court concluded in <u>State v. Harbison</u>, 539 S.W.3d 149 (Tenn. 2018), that each act of employing a firearm during the commission of a dangerous felony may be prosecuted as a separate offense:

> [We] conclude that the legislature intended the unit of prosecution for Tennessee Code Annotated section 39-17-1324 to be each act of employing a firearm during the commission of or attempt to commit a dangerous felony. Nothing in the language of the statute indicates that the legislature intended to limit the unit of prosecution to the number of firearms employed by a defendant. Therefore, Harbison's three convictions for employing a firearm during the commission of a dangerous felony based on three convictions for the attempt to commit voluntary manslaughter involving three victims do not violate the prohibition against double jeopardy.

<u>Id.</u> at 169-70.

Accordingly, this assignment is without merit.

### D. Sentence Enhancement for Counts 15-18

- 7 -

Applying Tennessee Code Annotated section 39-17-1234(h)(2), the trial court enhanced the Defendant's sentences in Counts 15 through 18 from six years to ten years. However, as the parties agree, this court concluded in Josh L. Bowman v. State, No. E2016-01028-CCA-R3-PC, 2017 WL 1449232, at *7 (Tenn. Crim. App. Apr. 24, 2017), perm. app. denied (Tenn. Aug. 16, 2017), that prior felony convictions used for enhancement purposes must have been "dangerous" felonies before there may be enhanced sentences pursuant to this statute. Accordingly, the State agrees that, because the Defendant's prior felony convictions were for simple drug possession and not statutory dangerous felonies, enhancement was in error. We agree, and reverse and dismiss Counts 15 through 18.

## II. Sentencing

On appeal, the Defendant argues that the trial court abused its discretion by ordering partial consecutive sentencing. The State disagrees, as do we, for reasons which we will explain.

Initially, we note that since we have reversed and dismissed the enhanced firearm convictions in Counts 15 through 18, and reinstated the merged convictions in Counts 2, 4, 8, 10, and 12, the Defendant's effective sentence is 52 years, rather than 60.

A trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including that the defendant is an offender whose record of criminal activity is extensive or that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Id. § 40-35-115(b)(2), (4). When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). We review the trial court's consecutive sentencing determinations for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. See State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the same deferential standard announced in State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012)).

The sentencing order sets out that the trial court found that the Defendant had "accosted" the victim, Mr. Dixon, at the convenience store, held a gun to his head and demanded his car keys. The Defendant's weapon did not fire the first time he pulled the trigger, and, as Mr. Dixon ran towards the store, the Defendant fired multiple shots

towards him. Mr. Dixon was struck twice in his leg, resulting in a year's recovery before he could again walk, which, at the time of trial, he did with a pronounced limp. The second victim, Carl Chesney, who was a customer in the store, was struck in the foot by a bullet, resulting in serious bodily injury. Additionally, the court noted that the Defendant had an extensive criminal history, which included five felony and four misdemeanor drug convictions. Based upon all of this, the court determined that the enhancement factors which applied were that the Defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range; that he was the leader in the commission of an offense involving two or more criminal actors, and was the one in the group who had demanded the car keys from the victim and fired the shots striking the two victims; that the offenses involved more than one victim; that previously the Defendant had failed to comply with the conditions of a sentence involving release into the community, in that four previous times he had been placed on probation, he had been found to have violated the conditions and the probations had been revoked; and that the Defendant had no hesitation committing a crime when the risk to human life was high, in that he had fired a semi-automatic pistol at a fleeing victim who was running into a gas station, with a number of people in his line of gunfire, and with one bystander being wounded and a number of others being potential victims.

The court found that the Defendant was a professional criminal, given his multiple convictions and "lack of any work history," and had knowingly devoted his life to criminal acts as a major source of his livelihood. Further, the court determined that the Defendant was a dangerous offender whose behavior indicated that he had little or no regard for human life, especially because he previously had pled guilty to a felony gun offense and to four felony drug offenses, and knew as a convicted felon that he was not allowed to possess firearms. The court also noted that on the day that the Defendant shot Mr. Dixon and Mr. Chesney, the Defendant was out on bond while awaiting sentencing on five felony convictions. Accordingly, the court imposed consecutive sentences, as we have set out.

The trial court's thorough sentencing order shows that proper consideration was given to the sentencing principles, the facts of the two shootings, and the Defendant's extensive criminal history. From all of this, we conclude that the record easily supports the sentences.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments for Counts 1 through 14 and reverse the judgments for Counts 15 through 18, which are

dismissed.  We reinstate the merged judgments in Counts 2, 4, 8, 10, and 12.  The case is remanded for entry of amended judgments consistent with this opinion.


_____

ALAN E. GLENN, JUDGE